### In re Ángel Rivera Colón, querellado.

Núm. 60.—*Sometido:* Diciembre 15, 1944. *Resuelto:* Marzo 6, 1945.

*Benicio Sánchez Castaño* y *Dubón & Ochoteco,* abogados del quere-
llado; *R. A. Gómez, Fiscal del Tribunal Supremo,* abogado de
El Pueblo.

EL JUEZ PRESIDENTE SEÑOR TRAVIESO emitió la opinión del
tribunal.

Los hechos y antecedentes que han motivado este procedi-
miento de *disbarment,* aparecen detalladamente expuestos en
las opiniones emitidas por este Tribunal en el caso civil
número 8639, "el menor Luis Calderón, representado por
su madre *Santiaga Calderón* v. *Manuel Cacho Vega",* resuelto
en noviembre 24, 1943 (62 D.P.R. 620) y en el procedimiento
de disbarment número 56, *In re Víctor Rivera Colón y Angel
Rivera Colón,* querellados, resuelto en junio 1 de 1944, (63
D.P.R. 713). La repetición de dichos hechos haría innece-
sariamente larga esta opinión. Creemos, sin embargo, que
para la mejor comprensión de la cuestión aquí envuelta se
hace necesario que hagamos una breve reseña de los hechos
pertinentes al caso.

El niño Manuel Calderón, del pueblo de Morovis, recibió
en la frente una patada de un caballo propiedad de Manuel
Cacho. La madre del menor encargó de la reclamación de
daños y perjuicios al abogado Víctor Rivera Colón y a su
hermano, el aquí querellado, quienes estaban asociados en
el ejercicio de la abogacía. Los referidos abogados radica-
ron en 28 de octubre de 1938 ante la Corte de Distrito de
Arecibo una demanda contra Manuel Cacho Vega, en recla-
mación de daños y perjuicios por la suma de $5,000. Ha-
biéndose negado la corte de distrito a consentir que se

desistiera de la acción ante ella pendiente, por haberse radicado ante la Corte Municipal de Ciales, por los mismos abogados, otra demanda por la misma causa, en la que se reclamaba la cantidad de $150 por daños al menor y $50 para honorarios de los abogados, éstos radicaron en la corte de distrito una demanda enmendada incluyendo a Ignacio Cacho como demandado, por ser éste arrendatario de la finca, y una moción en la que alegaron que estaban convencidos de que el demandado Manuel Cacho Vega no era responsable por el accidente; que el único responsable era su hijo Ignacio Cacho, como arrendatario de la finca y dueño del caballo; y que Ignacio Cacho les había ofrecido la suma de $200 para transigir el pleito. Solicitaron la aprobación de la propuesta transacción y la corte, después de examinar al niño, al darse cuenta de las graves consecuencias de la herida recibida por el menor, resolvió no aprobarla. La demanda fué nuevamente enmendada en enero 26 de 1939 para eliminar de ella a Ignacio Cacho, dejando como único demandado a Manuel Cacho Vega, por ser éste el solo dueño de la finca y del caballo.

El pleito iniciado en octubre 28, 1938 fué por fin a juicio en agosto de 1941, recayendo sentencia a favor del menor por la suma de $1,300, costas y $200 para honorarios. La sentencia fué revocada y el caso devuelto a la corte inferior para la celebración de un nuevo juicio. Expondremos brevemente los motivos que tuvimos para la revocación.

Manuel Cacho alegó como defensa que él no estaba en posesión de la finca ni se servía del caballo en la fecha del accidente. Para probarlo, ofreció en evidencia un contrato de arrendamiento de la finca celebrado entre él y su hijo Ignacio desde junio de 1937, formalizado en un documento privado redactado por el abogado Angel Rivera Colón. Presentó además, ciertos records de la Administración de Ajuste Agrícola, de los que aparecía que a base de dicho contrato de arrendamiento, Ignacio Cacho venía recibiendo desde

antes del accidente compensación de suelo en relación con el tabaco que todos los años cultivaba en la finca. Al declarar Ignacio Cacho en relación con el contrato de arrendamiento, el abogado Angel Rivera Colón le preguntó si era o no cierto que en mayo de 1939 él había jurado una denuncia ante el Juez de Paz de Morovis, en relación con el hurto de unos ñames, en la cual denuncia él había hecho constar que los ñames hurtados eran propiedad de su padre Manuel Cacho, cuyos bienes él administraba. Ignacio contestó que así se había hecho constar por error de su cuñado, quien había preparado la denuncia, pero que lo cierto era que él era el arrendatario de la finca y dueño de los ñames hurtados, y que así lo había declarado ante el juez de paz en presencia del abogado de los acusados, el aquí querellado. Al terminar la evidencia del demandado, el abogado Angel Rivera Colón ofreció su propia declaración para probar que el contrato de arrendamiento era una mera simulación. La Corte sostuvo la oposición del demandado y no permitió que el abogado declarase sobre comunicaciones de carácter privilegiado. Porque creíamos que la corte inferior erró al apreciar la prueba y también al rechazar la declaración ofrecida por Rivera Colón, sin antes investigar si éste había actuado como abogado de los contratantes o si se había limitado a actuar como mero instrumento para poner por escrito lo que ellos dijeron haber convenido, revocamos la sentencia y ordenamos la celebración de un nuevo juicio.

En la opinión que dictáramos al revocar la sentencia y ordenar un nuevo juicio, se hizo constar que la conducta profesional de los abogados del menor—la que expusimos con todos sus detalles—nos parecía por demás extraña, razón por la cual se ordenó al fiscal de esta Corte que practicara una investigación. Practicada ésta, el fiscal radicó una querella solicitando el disbarment de los abogados Angel y Víctor Rivera Colón. Celebrada la vista de dicha querella, en junio 1 de 1944 dictamos una resolución censurando a los

dos querellados por sus actuaciones en el caso del menor Calderón contra Manuel Cacho Vega. En la opinión que sirvió de base a dicha resolución hicimos constar expresamente que nos absteníamos de hacer pronunciamiento alguno "en cuanto a la participación que en la preparación de dicho contrato haya podido tener el querellado Angel Rivera Colón, pues no habiéndose formulado un cargo contra él sería impropio que hiciéramos un pronunciamiento en cuanto a esos hechos, sin que el querellado haya tenido una oportunidad de ser debidamente informado del cargo y de presentar su defensa"; y, en consecuencia, ordenamos al fiscal que formulara una nueva querella contra el abogado Angel Rivera Colón en relación con la participación que haya podido tener en la preparación del alegado contrato simulado.

El 28 de septiembre de 1944, el fiscal radicó una querella en contra del abogado-notario Angel Rivera Colón, formulando en contra de dicho abogado el siguiente cargo:

"Que allá por el mes de junio de 1937, en la municipalidad de Morovis, Puerto Rico, el querellado Ángel Rivera Colón, actuando como abogado-notario en el ejercicio de tales profesiones intervino en, preparó y redactó un documento de arrendamiento otorgado por Manuel Cacho Vega y su esposa Dolores Parés Sánchez a favor del hijo de éstos, Ignacio Cacho Parés, sobre la siguiente finca rústica: (aquí sigue la descripción de la finca), teniendo el dicho abogado-notario querellado Ángel Rivera Colón perfecto conocimiento de que dicho contrato de arrendamiento era simulado y no se proponía que tuviera valor alguno entre las partes otorgantes del mismo, y que dicho documento se otorgaba únicamente con el propósito de obtener cuota para la siembra de tabaco en la mencionada finca rústica objeto de dicho contrato de arrendamiento."

Contestó el querellado admitiendo todos los hechos alegados en la querella, con excepción de que él tuviera conocimiento en la fecha en que fué otorgado que dicho contrato fuera uno simulado. Alegó el querellado, que él tuvo conocimiento por primera vez de que el aludido contrato era simulado, el 12 de mayo de 1939, cuando compareció ante

la Corte Municipal de Ciales como abogado defensor de los acusados en el caso criminal número 3939, *El Pueblo* v. *José Padilla Colón* y *Joaquín Ortiz,* sobre daños maliciosos; que fué durante la vista de dicha causa que se enteró de que el contrato era una simulación, cuando oyó al propio arrendatario Ignacio Cacho declarar que él en todo momento no había sido otra cosa que un administrador de la finca; que fué al enterarse de que el contrato era una simulación que el querellado, como abogado del menor Calderón, se opuso a la defensa que había interpuesto Manuel Cacho Vega en el pleito seguido contra él por daños y perjuicios, consistente dicha defensa en alegar que en la fecha del accidente de que fué víctima el menor Calderón, él, Manuel Cacho, no tenía el control o administración del inmueble por haberlo arrendado a su hijo, Ignacio Cacho; y que de haber tenido conocimiento en la fecha de su otorgamiento que el contrato de arrendamiento era simulado, el querellado jamás hubiera intervenido en su redacción, y por el contrario hubiera aconsejado a las partes para que no lo otorgaran, ''no obstante no haberse causado perjuicio alguno a terceras personas con dicho otorgamiento''.

El caso fué visto y quedó sometido a nuestra decisión en diciembre 15 de 1944.

Haremos ahora un resumen, en orden cronológico de todo lo declarado en relación con el alegado contrato simulado, antes y en la vista del caso ante esta Corte.

En la primera vista del caso del menor contra Manuel Cacho Vega, éste declaró: que es dueño de la finca en donde ocurrió el accidente; que compró la finca al Banco y la arrendó a su hijo Ignacio en junio de 1937, por cuatro años, mediante un documento; que su hijo le pagaba $500 anuales y las contribuciones; que Ignacio Cacho ocupa la finca como arrendatario y no como administrador.

José Vélez, empleado de la Triple A, declaró que en el año 1938 fué enviado por el Departamento a asignar las

cuotas de tabaco en los barrios de Morovis; que para poder obtener cuota era necesario tener un contrato de tabaco y ser arrendatario o dueño de una finca; que para esa fecha tuvo que hacerle un contrato de tabaco a Ignacio Cacho, quien le mostró un contrato de arrendamiento que había hecho con Manuel Cacho; que el contrato que se le exhibe es el mismo que le mostró Ignacio Cacho y que lo reconoce porque él puso una nota fechada en mayo 11, 1938, que dice: "Visto este documento presentado por Ignacio Cacho Parés para asignación de cuota para tabaco. J. V."

Ignacio Cacho declaró que se dedica a la agricultura en una finca que es propiedad de su padre y que éste le arrendó en 1937 por contrato escrito ante el notario Angel Rivera Colón; que desde esa fecha está en posesión de la finca y continuará en ella hasta el final del arrendamiento en 1941; que él y su papá habían hablado sobre el arrendamiento de la finca, y ese domingo, al ver pasar el Lic. Rivera Colón le encargaron que les hiciera un contrato; que al regresar de Morovis ese mismo día el abogado·les trajo el contrato y él y su padre lo firmaron; que es cierto que ante la Corte Municipal de Ciales, se presentó una denuncia, que el firmó, haciendo constar que los acusados habían hurtado bienes de la propiedad de su padre Manuel Cacho; que la denuncia fué redactada por Félix Rodríguez y él la firmó sin saber lo que decía; que al oír leer la denuncia en el juicio, él le dijo al juez "que se debía acreditar que yo era el verdadero dueño de eso y no era Manuel Cacho"; que él paga por el arrendamiento $500 y las contribuciones, pero que el abogado no quiso poner eso en el documento "porque dijo que era de hijo y padre"; que no recuerda si cuando él firmó esa denuncia, en mayo 1, 1939,·ya había ocurrido el accidente de la patada al niño.

Del récord taquigráfico de la vista ante esta Corte Suprema del caso de Disbarment núm. 56, ofrecido en el pre-

sente caso como *Exhibit* 2 del Fiscal, aparece Ignacio Cacho Parés declarando lo siguiente:

"P. ¿Quién hizo ese contrato de arrendamiento?

R. Ángel Rivera Colón.

P. ¿En qué forma se hizo el contrato de arrendamiento?

R. Nosotros, el papá mío y yo, estábamos en la casa esperándolo que él subiera. Entonces lo paré y lo mandé a entrar y cuando entró mi papá le explicó que si se podía hacer un arriendo entre padre e hijo. Él le dijo que sí, que cómo no, y entonces entró a explicar que una escritura valía como $18 ó $20 y que un documento de la clase que él lo hizo valía $6 u $8 pesos. Entonces se llevó los datos de la finca, lo que se iba a pagar por todo, y entonces cuando bajó de Morovis para Ciales le iba a dejar el documento de arriendo y entonces dijo que se lo llevaba para sellarlo, que entonces se lo llevó y a los pocos días volvió y dijo que allí estaba el documento, pero que no lo había sellado porque se le había olvidado mandar una nota al distrito y se le olvidó incluirlo en la nota. Entonces dijo que el contrato valía lo mismo así sellado que sin sellar; que era hecho por él y figuraba su firma allí.

P. Eso fué lo que pasó en relación con el documento. Ahora le pregunto, ¿usted oyó al Sr. Ángel Rivera Colón declarar en la Corte de Distrito de que su padre y usted le dijeron que preparara ese documento, que era simulado, y que su padre quería que usted apareciera como arrendatario de esa finca para obtener los beneficios de la triple A, y él declaró que ese documento era falso y dijo que ustedes no le habían dicho las cantidades ni el tiempo del arrendamiento?

R. No sé. Nosotros le dimos la cantidad y el tiempo y todo.

P. ¿Usted lo oyó a él declarar eso?

R. El día que fuimos a Arecibo él lo declaró.

P. Si lo declaró, ¿no es verdad?

R. No, señor. Nosotros no le dijimos nada de eso. Para cobrar dinero en las tres A no se necesita documento de esa clase. Él le dijo a la Corte que era para las tres A.

P. ¿Pero si la finca era de su padre, cómo podía decir eso?

R. Él dijo en la corte que era para obtener eso.

P. ¿Cómo podía darle la cuota a usted si la finca era de su padre?

R. Él declaró eso, que era para yo obtener los beneficios.

P. ¿Quién obtuvo los beneficios de la triple A, usted o su papá?

R. Bueno, yo, porque la finca aparecía arrendada a mí y fué un

Inspector y como yo era el que aparecía allí pues los beneficios me pertenecían, y después entonces declararon los inspectores de las tres A que el verdadero dueño era yo."

Declarando ante la Corte de Distrito de Arecibo, en el nuevo juicio ordenado por esta Corte Suprema, el abogado Angel Rivera Colón, declaró, en síntesis, como sigue:

Que allá para el mes de junio, 1937, un domingo por la mañana, al pasar frente a la casa de Manuel Cacho, éste le llamó y llamó a su hijo Ignacio que estaba en la casa; que entonces en presencia de Ignacio, Manuel Cacho le dijo: "Necesito que me prepares un contrato de arrendamiento donde yo aparezca arrendándole la finca a Ignacio"; que entonces él le preguntó sobre las estipulaciones del contrato y Cacho le dijo que le pusiera un canon razonable y por el tiempo que quisiera porque el contrato se hacía "con el fin de conseguir cuota de asignación para la siembra de tabaco", añadiendo: "Yo quiero que esa cuota quede a nombre de Ignacio y no a nombre mío porque yo tengo la de Torrecillas y la finca ya con cuotas asignadas, y poniéndole la finca arrendada a Ignacio, yo podría conseguir cuota a nombre de Ignacio"; que de acuerdo con esas instrucciones preparó el contrato de arrendamiento. Preguntado por el abogado del demandado si él había querido decir que el motivo que le dió Manuel Cacho para hacer el documento bajo simulación era el conseguir cuota, contestó: "Sí, señor, para tabaco a nombre de su hijo Ignacio, porque él tenía ya cuota en la finca de él". Preguntado de nuevo por el mismo abogado si Cacho le había dicho que el contrato era simulado, contestó: "Me dijo que era para los efectos de conseguir cuota, pero que Ignacio no le iba a pagar ningún canon de arrendamiento, que podía ponerle el canon que yo creyera razonable, yo creí que $500 era suficiente y le puse $500, y si mal no recuerdo, creo que le puse cuatro años y que no pagaría mejoras".

En la vista ante esta corte del caso de Disbarment núm. 56, (Exhibit 2 del Fiscal) el querellado Angel Rivera Colón, declarando en relación con el contrato de arrendamiento, dijo, en síntesis, lo siguiente:

Que él iba para Morovis el domingo y al pasar por la carretera frente a la casa de Manuel Cacho, éste y su hijo le llamaron y le dijeron que necesitaban hacer un contrato de la finca; que le dieron un documento del Banco Federal para tomar la descripción de la finca; que él les preguntó a los Cacho: "¿Por cuánto tiempo lo hago, cuánto es el canon?" y ellos le dijeron que pusiese el número que él creyese justo, un canon que considerara razonable y las demás estipulaciones que creyese conveniente; que él puso un término de cuatro años y un canon de 500 ó 600 dólares anuales. Preguntado por el Juez Sr. Snyder si no le había parecido extraño que las partes le permitieran a él fijar los términos del contrato, contestó: "Yo les dije, ¿por qué no me dan las cifras? y ellos me dijeron: 'Es un contrato para dárselo a un empleado de las AAA, a los efectos de la asignación de cuotas. Hazlo por más de tres años'"; que tomando en consideración esos hechos, lo que alegó Ignacio Cacho en la denuncia que hizo en 1939 y los incidentes del pleito, llegó a la conclusión de que el contrato era simulado. Preguntado por el Juez Sr. Todd, Jr., si él había declarado ante el Fiscal que los Cacho le habían dicho que "ese contrato no era con el fin de celebrar un contrato válido entre ellos, sino que era un contrato para conseguir cuota de tabaco, de las tres A", contestó que efectivamente así se lo habían dicho. Continuó declarando que cuando regresó de Morovis les entregó el contrato y no supo si lo firmaron, pues no lo volvió a ver hasta el día del juicio, que le pagaron dos dólares por su trabajo.

En la declaración prestada ante el Fiscal de esta Corte, en febrero 28 de 1944, el querellado declaró, además, que cuando él le preguntó a los Cacho que cuál sería el término

.del arrendamiento y el canon, le contestaron: "Lo que usted quiera, eso es asunto de padre e hijo"; que él presumía que como Manuel Cacho tenía fincas y tenía cuotas, parece que quería que esa cuota se la asignaran al hijo, porque así podía conseguir mayor cantidad; que a su juicio era un contrato para ellos dos solamente para ese fin, según le explicaron ellos ese día, "porque yo les pregunté sobre el canon y me dijeron que pusiera lo que quisiera, y el tiempo que quisiera; me dieron amplia facultad."

En la vista del presente caso, el querellado declaró substancialmente lo mismo que ya había declarado ante la corte de distrito. Insistió en que cuando redactó el contrato él estaba seguro de que no podía defraudarse a la triple A, porque la cuota la podía obtener lo mismo el hijo que el padre; que él no tuvo conocimiento de la simulación hasta mayo 12 de 1939, cuando el asunto de la denuncia por el hurto de unos ñames; y que fué entonces que se formó en su mente la idea firme y fundada de que el contrato era simulado.

En la segunda vista del caso del menor Calderón contra Manuel Cacho, las partes lo sometieron por la misma prueba practicada en la vista anterior, con excepción de las declaraciones adicionales de Angel Rivera Colón en cuanto al hecho de que el contrato era simulado, y las de Manuel e Ignacio Cacho, ambas tendientes a sostener la existencia y validez del arrendamiento. La Corte de Distrito de Arecibo, dando entero crédito a la declaración de Angel Rivera Colón resolvió "que el contrato de arrendamiento que se alegó como existente entre Manuel Cacho y su hijo Ignacio Cacho Parés fué una mera fórmula simulada para que el hijo se encargara de la finca que es propiedad del padre". El caso volvió por segunda vez ante esta corte y en diciembre 12 de 1944 confirmamos la sentencia a favor del menor.

Establecido ya definitivamente que el contrato redactado por el querellado fué una simulación, lo único que nos queda por resolver es si de toda la evidencia que hemos analizado

resulta probado que el querellado sabía en la fecha en que redactó el contrato que éste no habría de ser firmado por las partes como una obligación real y efectiva y sí como una simulación.

Analizada serenamente toda la evidencia, no es posible llegar a otra conclusión que no sea la de que el querellado sabía que el contrato por él redactado era una mera simulación. El simple hecho de que los supuestos contratantes dejaran a su discreción o capricho la fijación del término y del canon del arrendamiento, con el aditamento de que esas condiciones carecían de importancia por tratarse de un asunto entre padre e hijo y que éste no iba en realidad a pagar canon alguno, debieron bastar para que el querellado se diese cuenta de que se le estaba utilizando y él se estaba prestando, como hombre conocedor de la ley por su condición de abogado, para revestir con todas las apariencias de un contrato legal, verdadero y existente, aquello que en realidad no era otra cosa sino una mera simulación.

El fiscal admite que no era necesario para que Manuel Cacho pudiera conseguir cuota de tabaco para su finca, que la hiciera aparecer simuladamente como arrendada a su hijo Ignacio; y que Manuel Cacho podía haber conseguido la cuota en su propio nombre. Empero, de la propia declaración del querellado se desprende que en la fecha en que el querellado redactó el contrato simulado, tanto el padre como el hijo creían que la simulación era necesaria para conseguir la cuota, y que el querellado con conocimiento de esos hechos redactó el contrato.

No obstante no haberse defraudado a la Triple A, opinamos que el querellado faltó a su deber profesional cuando se prestó a redactar y redactó un contrato dentro de las circunstancias reveladas por la evidencia. Su deber era haberse abstenido de intervenir en manera alguna en el proyecto que tenían en mente y que le revelaron los señores Cacho al encargarle de la redacción del documento. El contrato simu-

lado puede resultar un instrumento inofensivo, como resultó serlo en este caso, pero puede ser utilizado como un medio efectivo para la consumación de un fraude. · El abogado no ·debe en modo alguno ayudar a poner en manos de un ignorante o de un malvado un arma tan peligrosa. La mera sospecha de que se trata de una simulación debe bastar para que el abogado se abstenga de intervenir.

El contrato simulado redactado por el querellado no fué utilizado para defraudar a la triple A, pero sí se usó por Manuel Cacho para tratar de evadir la responsabilidad que sobre él recaía por el accidente ocurrido en su finca al menor Calderón.

*Es nuestro deber imponer al querellado nuestra censura por sus actuaciones en la redacción del contrato.*